**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**ALISHAEV BROTHERS INC.**

                **Plaintiff,**          **17cv7505 (JGK)**

      **- against -**           <u>**MEMORANDUM ORDER &**</u>
                                          <u>**OPINION**</u>

**LA GIRL JEWELRY INC et al.,**

                **Defendants.**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**JOHN G. KOELTL, District Judge:**

This is a case brought under New York state law – tort, contract, and statutory – in which the plaintiff, Alishaev Brothers, alleges that the corporate defendants, LA Girl Jewelry Inc. and Ner Precious Metals, Inc., and the individual defendants, Pedram Shamekh and Bahram Zendedel, defrauded the plaintiff into providing valuable gold jewelry for which the defendants had no intention of paying and which the defendants had no intention of returning to the plaintiff. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendants and because the amount in controversy in this case is greater than $75,000. On June 25, 2019, the Court conducted a one-day non-jury trial. Having considered all of the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

**The Parties**

1.   The plaintiff Alishaev Brothers Inc. is a corporation incorporated in New York, with its principal place of business at 20 West 47th Street, New York, New York, 10036. The plaintiff is engaged in the business of selling jewelry and precious stones. Stipulation of Facts ("SOF"), ¶ 1.

2.   Alishaev Brothers Inc. has three shareholders, all of whom are brothers: Simon Alishaev, Yuri Alishaev, and Joseph Alishaev. Tr. 4. Simon Alishaev is the president of Alishaev Brothers Inc. Id.

3.   The defendant LA Girl Jewelry Inc. ("LA Girl") is a corporation incorporated in California. SOF ¶ 2. Its principal place of business is in California. Ex. 32.

4.   LA Girl has defaulted in this action and a Certificate of Default was entered in this action by the Clerk of the Court on October 23, 2018. Dkt. No. 54.

5.   The defendant Ner Precious Metals, Inc. ("Ner") is a corporation incorporated in California, with its principal place of business at 640 S. Hill Street, Los Angeles, California 90014. SOF ¶ 3. Ner is engaged in the business of buying and selling pure gold. Tr. 126.

6.     The defendant Pedram Shamekh ("Shamekh") resides in Los
       Angeles, California. SOF ¶ 4. Shamekh is the sole
       shareholder, officer, and director of Ner. SOF ¶ 5; Tr.
       85, 142. Shamekh is a citizen of California.

7.     The defendant Bahram Zendedel, a/k/a Robert Zendedel and
       Bahram Robert Zendedel ("Zendedel") resides in Los
       Angeles, California. Zendedel is the sole shareholder and
       director of LA Girl. SOF ¶¶ 6-7. Zendedel is a citizen of
       California.

**The Transactions with Defendants**

8.     Zendedel and Shamekh attended the 2017 JCK Jewelry Show in
       Las Vegas, Nevada, which was held on June 5 through June
       8, 2017. The plaintiff showcased a booth at the show,
       which Zendedel and Shamekh visited. SOF ¶ 8; Tr. 63, 86-
       87.

9.     At the JCK Jewelry Show, Zendedel and Shamekh represented
       themselves to the plaintiff as partners in the jewelry
       business. As Simon Alishaev testified, Shamekh and
       Zendedel told Simon Alishaev that Shamekh and Zendedel
       were opening a new business as a jewelry wholesaler in Los
       Angeles. Zendedel referred to Shamekh as the person who
       would fund the business during its early stages. Tr. 7-9.
       Zendedel stated to Simon Alishaev at the time that Shamekh

was his partner, and that "he is my back." Tr. 66. Zendedel held Shamekh out as Zendedel's partner, and the plaintiff relied on that representation when it provided credit to the defendants-to the plaintiff's detriment. See, e.g., Tr. 8 ("[A]nd I have with me Pedram [Shamekh], who is the guy backing me up, and he' s the guy with the money and he's going to invest.") (Simon Alishaev); Tr. 9 ("[A]nd then he says he doesn't have no problem with the money. He has-Mr. Pedram is gonna back him up, he's backing us, and he's the man of the money . . . .") (same); Tr. 66 ("Q. In your mind, the single conversation you had with Mr. Zendedel at the jewelry convention in 2017 was sufficient to create the relationship between him and Mr. Shamekh; isn't that correct? . . . . A. With Mr. Zendedel it will not work because I knew him before, like I said before. He convinced me when he came both of them together to the booth and he says this is my partner, new partner Mr. Shamekh, and he is my back-like with money guys- Q. That's fine. A. -they are a rich family. You should not worry about anything else.") (same).

10. Shamekh was present at Alishaev's booth at the JCK Jewelry Show when these statements were made, Tr. 8, and both he and Zendedel spoke to Simon Alishaev on that occasion. Tr. 74. Shamekh echoed Zendedel's statements to Simon

Alishaev, representing to Simon Alishaev that he, Shamekh, was Zendedel's new partner and was working with him. Tr. 74. At no time did Shamekh state to any of the Alishaevs that he was not Zendedel's partner. Tr. 74.

11.  At the JCK Jewelry Show, the defendants ordered from the plaintiff assorted gold jewelry products for the price of $36,548.00, paid for with two checks in the name of LA Girl. SOF ¶ 9; Exs. 9, 10. Shamekh filled out the information on the checks given to Alishaev for this purchase. Tr. 10; Exs. 9, 10.

12.  On July 5, 2017, Shamekh and Zendedel went to the plaintiff's offices in New York City. Tr. 11-12, 88. At that time, the defendants purchased from the plaintiff additional gold jewelry products in the amount of $90,000.00, which the defendants paid for by issuing a series of checks to the plaintiff. Exs. 25, 28; SOF ¶ 10. At the time, Shamekh and Zendedel told Simon Alishaev that they had successfully sold a lot of the merchandise purchased from the plaintiff at the JCK Jewelry Show and wanted to purchase more merchandise. Tr. 11-12.

13.  The information on all the checks (i.e. payee and amount) was filled out by Shamekh except for the signature. Tr. 10, 88.

14. The July 2017 purchase was paid for by the defendants'
    giving post-dated checks for the jewelry purchased, in the
    amount of $90,000.00. These post-dated checks subsequently
    cleared. Exs. 25, 28; Tr. 12-13.

15. By paying for the jewelry, the defendants made the
    plaintiff believe that the defendants had good credit. At
    that time, the defendants and the plaintiff were happy
    with the business transactions that had taken place. See,
    e.g., Tr. 17, 19-21.

16. On August 7, 2017, Shamekh and Zendedel returned to the
    plaintiff's offices at 20 West 47th Street in Manhattan
    and purchased assorted gold jewelry products in the amount
    of $306,000.00 (the "August Sale" or "August
    transaction"). SOF ¶¶ 11-12; Tr. 19, 23-25; Ex. 11.

17. At that time, Shamekh and Zendedel told Simon Alishaev
    that they had been successful with their prior purchase of
    merchandise from the plaintiff. Tr. 19-21.

18. The defendants' selection and purchase of merchandise from
    the plaintiff in August 2017 was recorded on the
    plaintiff's security camera and those videos were produced
    at trial as Exhibits 67-70.

19. Zendedel signed the invoice for the $306,000.00 purchase
    of August 2017. The invoice states that a 1.5% monthly

finance charge would be charged on all past due amounts.
Tr. 21-23; Ex. 11.

20. The invoice has Ner's address on it. Tr. 27-28; Ex. 11.

21. This August 2017 purchase, although made in the name of LA
Girl, was paid for through the issuance of a series of
checks issued from an account maintained in Ner's name.
Two checks in the amount of $50,000.00 each were made
payable the date of the purchase, August 7, 2017. The
balance of the purchase price consisted of ten post-dated
checks, all issued from an account in Ner's name. SOF
¶ 13; Tr. 23-24; Ex. 32.

22. The checks were filled out by Shamekh and were issued from
an account maintained by Ner. Tr. 90.

23. The first two of these post-dated checks, dated August 21,
2017 and August 28, 2017, were negotiated. SOF ¶ 13; Exs.
14, 15.

24. On September 5, 2017, Shamekh and Zendedel together came
to the plaintiff's offices and took assorted gold jewelry
products in the amount of $297,169.17 "on memo," that is,
on consignment (the " Memo"). SOF ¶ 14; Ex. 12.

25. As Simon Alishaev explained, goods delivered on "memo"
means that the goods are on consignment. Tr. 13-14.

26. Zendedel received the merchandise ordered on Memo. Tr.
134.

27. Shamekh and Zendedel provided the plaintiff with 15 post-
    dated checks drawn on an account maintained in the name of
    LA Girl, totaling $296,500.00, in consideration for the
    goods received on Memo. At the same time, Shamekh and
    Zendedel exchanged one of the Ner post-dated checks for
    the August Sale, in the amount of $25,000.00, for cash
    that they gave to the plaintiff. At the same time, Shamekh
    and Zendedel exchanged two of the Ner post-dated checks
    for two checks issued on an account maintained in the name
    of LA Girl. SOF ¶ 17; Tr. 31-32; Ex. 18. Shamekh and
    Zendedel told Simon Alishaev that the reason for this
    switch was that the defendants had "opened a new bank
    account in New York City." Tr. 32.

28. When the defendants ordered the goods on Memo on September
    5, 2017, one of the checks previously given to the
    plaintiff for the August Sale, check no. 1040 in the
    amount of $20,000.00, which was drawn on one of Ner's
    accounts having insufficient funds (denoted by the bank on
    the face of the check as "NSF") was about to be returned
    by the bank. SOF ¶ 18; Exs. 16, 17; Tr. 25-26.

29. Zendedel and Shamekh apparently knew prior to September 5,
    2017, that check no. 1040 would be returned by the bank
    for insufficient funds, but they did not disclose that to
    the plaintiff when they came to plaintiff's offices on

September 5, 2017. As of September 5, 2017, when the defendants came to the Alishaev Brothers' offices to purchase more merchandise, the plaintiff had no knowledge that check no. 1040 was being returned by the bank for insufficient funds. See Ex. 17 (back of the check indicating September 8, 2017 return by the bank); Tr. 31.

30. If the plaintiff had known on September 5, 2017, that check no. 1040, issued in the August transaction, was issued from an account having insufficient funds and was going to be returned by the bank, the plaintiff would not have done any further business with the defendants. Tr. 30. This is consistent with the plaintiff's general policy that when a customer issues a bad check, it will not do business with that customer any longer. Tr. 56-57.

31. Shamekh testified that he did not remember if he knew that check no. 1040 would be returned for insufficient funds when he visited the plaintiff's offices on September 5 with Zendedel. Tr. 101-02. When confronted with Zendedel's deposition testimony (id. 136-38) that one week after Shamekh had issued the check on August 7, 2017 he knew it would be returned for insufficient funds, Shamekh testified: "Possibly. I don't remember." Id. 102. Shamekh repeated his "I don't remember" refrain in his later testimony. Id. 106-07. At his deposition, Shamekh stated

he did not remember, id. 151, and stated "maybe" the bank made a mistake by writing "NSF" on the check. Id. 150.

32. It was not until September 8, 2017, when check no. 1040 was returned by the bank for insufficient funds, that the plaintiff learned that the check had been issued from an account with insufficient funds. Ex. 17.

33. A few days later, the plaintiff learned that the last two post-dated checks issued for the August Sale, both dated September 11, 2017 (which on September 5, 2017 had been provided to the plaintiff in exchange for two Ner checks), were also being returned by the bank for insufficient funds: (1) check no. 1004 in the amount of $60,000; and (2) check no. 1005 in the amount of $75,000. SOF ¶ 19.

34. Subsequently, the first of the LA Girl post-dated checks issued for the Memo goods, check no. 1006, dated September 18, 2017, in the amount of $20,000, was also returned by the bank for insufficient funds. SOF ¶ 20.

35. Simon Alishaev first learned of problems with the defendants when he was informed by one of his supplier's salesmen in Los Angeles that Alishaev Brothers' jewelry, bearing the Alishaev Brothers trademark "ALI," was being sold in the Los Angeles area at below cost. In other words, the merchandise was being dumped onto the market. Tr. 36-37.

36. By letter dated September 27, 2017, Zendedel's attorney informed the plaintiff's attorney that Zendedel and LA Girl were unable to cover the remaining post-dated checks. SOF ¶ 21; Ex. 21. The plaintiff's counsel requested that LA Girl's counsel have the goods returned to the plaintiff, but the goods were not returned. Tr. 39.

37. All of the post-dated checks issued in connection with the September Transaction and $155,000 worth of post-dated checks issued as part of the August Transaction (Ex. 18) were worthless. Tr. 37. The first few checks were returned by the bank for insufficient funds and the remainder were never deposited because the defendants' counsel informed the plaintiff that LA Girl could not cover those checks. See Ex. 21.

38. Each of the post-dated checks issued in connection with the Memo goods was drawn against insufficient funds and was not negotiable.

39. In addition to its demand to LA Girl's counsel that the goods be returned, the plaintiff demanded the return of the gold jewelry merchandise from Shamekh and Zendedel individually, but the merchandise was not returned despite the defendants' admitted failure to pay for the goods. SOF ¶ 22.

40. Simon Alishaev called Shamekh's family demanding the return of the goods or payment. Shamekh's family did not comply. Tr. 39-40, 118-19. The plaintiff made separate calls to Shamekh and Zendedel for the return of the goods and for payment, but to no avail. Id. 40-42.

41. The defendants owe the plaintiff $451,714.74 for the goods sold and unpaid in the August transaction and those delivered on Memo in the September Transaction, Tr. 37-38; SOF ¶ 23, in addition to finance costs, collection fees, court fees, attorney's fees, and related expenses.

42. Of the $451,714.74 owed, $155,000 is attributable to the August transaction: the $20,000 check that was returned for insufficient funds, plus two other checks in the amounts of $60,000 and $75,000, respectively. Tr. 45-46; Ex. 33.

43. In addition to legal fees and expenses, which the August 2017 invoice (Ex. 11) states are recoverable by the plaintiff, the invoice provides for the plaintiff to recover a monthly finance charge of 1.5% on all past due amounts. Tr. 46 From September 1, 2017 through July 31, 2019, a total of 22 months, the total finance charge owed to the plaintiff that is attributable to the August Transaction ($155,000) is $51,150.

44. Both the invoice signed by Zendedel in the August transaction (Ex. 11) and the Memo signed by Zendedel in the September transaction (Ex. 12) provide for the recovery by plaintiff of its collection fees, attorney's fees, court fees, and all related expenses. Tr. 47-48.

45. None of the defendants ever objected to or protested the invoice or Memo issued in the August and September Transactions. Tr. 48.

46. In addition, pursuant to the express terms of the August invoice and September Memo (Exs. 11, 12), Zendedel personally guaranteed all of the terms of those transactions including the obligation to pay the amounts due in the August and September Transactions. Zendedel signed the guarantee part of the Memo in front of Simon Alishaev and Shamekh. Tr. 48.

**Shamekh and Zendedel Held Themselves Out to Alishaev Brothers as Partners**

47. Zendedel and Shamekh acted jointly in the commission of the above acts. By their conduct and statements to the plaintiff, they held themselves out as partners.

48. It was always the plaintiff's understanding that Shamekh and Zendedel were partners. Tr. 36. Ample evidence of the partnership, and evidence that the individual defendants held themselves out as partners, exists.

49. As Simon Alishaev testified, Shamekh and Zendedel told Alishaev that they were opening a new business together as a jewelry wholesaler in Los Angeles. Zendedel referred to Shamekh as the person with the funds to be used to start the business. Tr. 7-9. Zendedel stated to Alishaev at the time that Shamekh was his partner, and that "he is my back." Id. 66. Shamekh echoed Zendedel's statements to Alishaev, representing to Alishaev that he, Shamekh, was Zendedel's new partner and was working with Zendedel. Id. 74.

50. At no time did Shamekh state to any of the Alishaevs that he was not Zendedel's partner. Tr. 74.

51. At the JCK Jewelry Show, the defendants ordered from the plaintiff assorted gold jewelry products for the price of $36,548.00, which were paid for soon after by two checks issued from an account maintained in Ner's name. SOF ¶ 9.

52. On July 5, 2017, Shamekh and Zendedel went to the plaintiff's offices in New York City. Tr. 11-12, 88. Shamekh claimed that Zendedel had asked Shamekh to accompany Zendedel for the trip to New York, but Shamekh paid for his own airfare to New York and was not reimbursed for it by Zendedel. Id. 88-89.

53. On August 7, 2017, Shamekh and Zendedel purchased from the plaintiff additional gold jewelry products in the amount

of $90,000.00, which they paid for by the issuance of a series of checks issued from an account in Ner's name. SOF ¶ 10. The information on all checks (i.e., payee, amount) was filled out by Shamekh. Tr. 10, 88. The August 2017 invoice (Ex. 11) has Ner's address on it. The August 2017 purchase, although made in the name of LA Girl, was paid for through the issuance of a series of checks issued from an account maintained in Ner's name. SOF ¶ 13; Tr. 23-24. With respect to the visit to plaintiff's offices in August 2017, both Shamekh and Zendedel negotiated the prices for the merchandise, with Shamekh doing most of the talking. Tr. 34-36.

54. With respect to the September transaction, Shamekh and Zendedel provided the plaintiff with 15 post-dated checks drawn on an account maintained in the name of LA Girl, totaling $296,500.00, in consideration for the goods received by Memo. At the same time, Shamekh and Zendedel exchanged one of the Ner post-dated checks for the August Sale, in the amount of $25,000.00, for cash which they gave to plaintiff. At the same time, Shamekh and Zendedel exchanged two of the Ner post-dated checks for two checks issued on an account maintained in the name of LA Girl. SOF ¶ 17; Tr. 31-32. Shamekh and Zendedel told Simon Alishaev that the reason for this switch was that

defendants had "opened a new bank account in New York City." Tr. 32.

55. The video recordings of the visit by Shamekh and Zendedel to the plaintiff's offices in August 2017 (Exs. 67-70), show that Shamekh and Zendedel were acting jointly and participating together in the selection, weighing, bagging and negotiating prices for the merchandise purchased. They both looked at and selected merchandise, Tr. 50-51; they both watched as the goods were weighed, Id. 53. Shamekh was observing the entire transaction; he weighed and calculated the weights while Zendedel was walking around the showroom. Id. 54-55. Shamekh is shown taking out a series of checks and filling them out and signing them. Id. 55. Yuri Alishaev testified that it was Shamekh who negotiated the price with him. Shamekh did most of the talking. Id. 77-79. And Shamekh bagged the goods. Id. 112. Shamekh did not refute this testimony, other than to say that he did not remember if he negotiated the price. Id. 84. Shamekh conceded that he had discussed the weights of the merchandise with Yuri Alishaev. Id. 85.

56. Shamekh's attempt to distance himself from his partnership role was not credible. When questioned why in August 2017 he again went with Zendedel from Los Angeles to the plaintiff's office in New York City, Shamekh stated "for

other reasons" and stated that while in New York, he was asked by Zendedel to accompany him to the plaintiff's offices. Tr. 89-90. This is contradicted by Shamekh's sworn declaration to a California Court, discussed below. Shamekh testified that "maybe" we [he and Zendedel] were on the same plane. Id. 95. Shamekh also testified that at the August visit to the plaintiff's offices, he looked at the merchandise "[j]ust to give a little bit of personal opinion." Id. 112. At his deposition, Shamekh testified incorrectly that he might have gone around for a minute to see what kind of store it is, out of curiosity. Id. 145. The video, however, shows Shamekh did much more than that, including weighing, selecting, bagging, and negotiating prices for merchandise. At his deposition, Zendedel testified incorrectly that Shamekh did not even look around at the jewelry. Id. 135

57. Shamekh and Zendedel submitted a joint declaration to the Superior Court of the State of California, Los Angeles County, dated August 3, 2017, signed by both of them, for the purpose of requesting a continuance of a trial in Los Angeles. In that joint declaration, Shamekh and Zendedel declared under oath that "we contacted some of our important business clients in New York and made arrangements to fly out to New York the following week,

leaving Monday evening August 7, 2017, and planning a
return for Thursday, August 10, 2017." Ex. 20 ¶ 4; Tr. 94-
95. Shamekh testified that he was "comfortable" with the
language his lawyer used in the declaration. Tr. 94.

58. Shamekh and Zendedel are shareholders and directors in a
company called Rosalyn Food Mart, Inc., and worked
together with respect to that business. Tr. 81.

59. Shamekh and Zendedel also entered into a joint business
venture to operate a nail salon in Los Angeles, but the
business never worked out. Tr. 82.

## The Loan Excuse

60. The defendants claimed that the August 2017 checks issued
by Ner were loans made by Shamekh or Ner to Zendedel and
LA Girl. This argument is unsupported by any credible
evidence.

61. Although records purporting to document loans by Shamekh
and Ner to Zendedel and LA Girl were produced, none were
dated after May 2016. Tr. 115; Ex. 55. At trial, Shamekh
suggested that it is possible he wrote down the alleged
"loans" relating to the checks issued by Ner in the August
transaction, but then threw the papers away. Tr. 116. He
then testified that he does not remember throwing them
away, but "probably did." Id.

62. Zendedel's deposition testimony also refutes Shamekh's claim that he gave Ner the August 2017 checks as a "loan." Zendedel testified at his deposition that Shamekh gave the checks because Zendedel did not have his checkbook. Tr. 136-38.

**Transfers**

63. Zendedel signed and issued to Shamekh a Short Form Deed of Trust and Assignment of Rents (along with a promissory note) ("Deed of Trust"), which mortgaged Zendedel's house in California to Shamekh. The Deed of Trust is dated September 26, 2017, 21 days after the September 5, 2017 transaction with the plaintiff. Tr. 117; Ex. 56. When asked why this was done "coincidentally" at that precise time, Shamekh glibly stated: "personal choice." Tr. 118. Yet, Shamekh did not file a cross-claim in this action against Zendedel and LA Girl regarding the "loans" allegedly made by Shamekh to Zendedel. Id. 126.

64. Zendedel testified at his deposition that he transferred his house to his wife "last month," which, given the date of his deposition on May 23, 2018, would have been in April 2018. Tr. 132.

**Both LA Girl and Ner issued Checks Against Insufficient Funds**

65. The first check to bounce issued by Ner was check no. 1040 in the amount of $20,000.00.

66. Issuing a check from an account with insufficient funds was not an unusual occurrence for Ner. Shamekh admitted having issued checks from a Ner account on insufficient funds before, saying "[i]t's a – it's business. It's – it happens sometimes." Tr. 102. He also wrote bad checks to another supplier of gold, Kahan Jewelry, located in the same building as the plaintiff and those checks were returned at about the same time as the checks to plaintiff were being returned. Id. 102-04.

67. Ner had recurring negative balances in its bank account on the dates of August 9, 25, 29, and 30, 2017. Shamekh's response to these facts was: "It's a business thing." Checks were written without funds backing them up and were to be covered later. Tr. 124

68. Ner had a negative balance in its bank account on September 6, 2017, a day after the September 5, 2017 transaction, and on September 18, 2017. Tr. 125.

69. The last transaction entered into by Ner was a few months before this trial in June 2019, and when asked whether Ner was out of business, Shamekh responded "[n]o, it's not out

of business. The gold – pure gold business is not as good as it used to be so that's why I am looking into other businesses as well." Tr. 126.

70. Zendedel and LA Girl have been sued before for purchasing gold using checks issued against insufficient funds. Tr. 131.

71. Zendedel admitted that the post-dated checks to the plaintiff were issued when Zendedel and LA Girl had sufficient funds in the account to cover them. Tr. 139-40.

**Shamekh's Use of the Ner Bank Account for Personal Use**

72. The Ner bank statements for the period April 2017 through June 2018 indicate Shamekh's use of the Ner bank account for Shamekh's personal use. For example, Ner's bank statements show purchases on iTunes, checks for Nationwide Appraisal and Wells Fargo Home Loans, purchases at Zara and Charles Tyrwhitt, many restaurant purchases, and payments to a school that Shamekh claimed was a donation. Ex. 71; Tr. 123-24. Shamekh's denial that these were personal expenses, and his explanations that these were business expenses, are not credible. Tr. 119-24. The Ner bank statements show repeated payments for food and clothing and regular payments to a religious institution. Id. 122-124.

## Disregard of Corporate Separateness Between Ner and LA Girl

73.  Zendedel and Shamekh treated their respective corporations as one and the same entity, and transactions for one were credited to the other. For example, checks for merchandise were issued by Shamekh's corporation, Ner, while the goods were purportedly purchased on behalf of Zendedel's corporation LA Girl.

## CONCLUSIONS OF LAW

## Jurisdiction and Venue

1.  This court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the plaintiff and the defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00 exclusive of interests and costs because the defendants allegedly owe the plaintiff in excess of $451,714.74.

2.  Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events, acts, or omissions giving rise to these claims occurred in New York County, New York.

**Zendedel and Shamekh are Liable for Each Other's Acts Under New York Law**

3.  Before undertaking to determine whether the defendants are liable for each of the plaintiff's claims, it is helpful first to determine whether liability will attach to corporate and individual defendants equally and whether liability will be joint and several among the defendants.

4.  Where two persons are introduced to a plaintiff as partners, or where they conduct themselves so as to give the plaintiff the impression that they are partners, they are both charged as partners with respect to the plaintiff. "It is not absolutely essential that a partnership should have actually existed to fasten liability upon [a partner]. A person not a partner may become so charged as to third parties by holding himself out as a partner and inducing credit on the faith of such relation." Taylor v. Meyer, 62 N.Y.S. 301, 302 (App. Div. 1900) (internal citations omitted). In that case, "such person will be estopped from denying liability for the act which induces the belief." Id.; see also JLG Architectural Prods., LLC v. WDF, Inc., 928 N.Y.S.2d 750, 752 (App. Div. 2011) (finding that estoppel barred the plaintiff from denying the existence of a partnership). The partners by estoppel will be jointly and severally liable to the

parties to which they hold themselves out as partners. <u>See</u>
<u>JLG Architectural Prods.</u>, 928 N.Y.S.2d at 752.

5.   The evidence shows that Shamekh held himself out as
Zendedel's partner, and the plaintiff relied on that
representation in deciding to conduct business with the
defendants and extend credit to the defendants. Shamekh
and Zendedel showed up together at the JCK Show, and
subsequently at the plaintiff's office in New York City.
They conducted themselves together in the plaintiff's
showroom as if they were partners with each other. Shamekh
filled out LA Girl checks in front of the plaintiff.
Zendedel held out to the plaintiff that Shamekh was
funding their new business. <u>See</u> <u>Fleet Bank NH v. Royall</u>,
630 N.Y.S.2d 559, 560 (App. Div. 1995) ("[A] person is
estopped from denying the existence of a partnership when
he, by words spoken or written or by conduct, represents
himself, or consents that another represent him, as a
partner in an existing partnership."). Shamekh cannot now
evade liability to the plaintiff by claiming that he was
not Zendedel's partner. The explanation that the
relationship between Shamekh and Zendedel was purely one
between a creditor and a debtor is not credible and
unsupported by the evidence. <u>See</u> <u>Taylor</u>, 62 N.Y.S. at 302
(declining to credit the defendant's threadbare denial

24

that there was a partnership). As partners by estoppel, Shamekh is liable to the plaintiff to the same extent that Zendedel is liable to the plaintiff and vice versa. As partners by estoppel, Shamekh and Zendedel are jointly and severally liable for any damages in this case.

**Piercing the Corporate Veil and Alter Ego Liability**

6. "The concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners." Morris v. New York State Dep't of Taxation & Fin., 623 N.E.2d 1157, 1160 (N.Y. 1993). "The doctrine of piercing the corporate veil is typically employed by a third party seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation." Id.

7. Under New York law, the party seeking to pierce the corporate veil must show "(i) that the owner exercised complete dominion over the corporation with respect to the transaction at issue; and (ii) that such domination was

used to commit a fraud or wrong that injured the party seeking to pierce the veil." Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997).

8.    Determining that veil-piercing is appropriate is a fact intensive inquiry and courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

Boroditskiy v. Eur. Specialties LLC, 314 F. Supp. 3d 487, 494 (S.D.N.Y. 2018) (quoting Freeman v. Complex Comput. Co., 119 F.3d 1044, 1053 (2d Cir. 1997)). "The concept is equitable in nature, and the decision whether to pierce the corporate veil in a given instance will depend on the facts and circumstances." Hyland Meat Co., Inc. v. Tsagarakis, 609 N.Y.S.2d 625, 626 (App. Div. 1994).

9.    With respect to the complete control prong of the equitable analysis, the evidence is sufficient to pierce Ner's corporate veil. During the period when the

26

transactions at issue in this case occurred, Ner was undercapitalized; Ner's funds were used by Shamekh for personal expenses; Shamekh completely dominated Ner as the sole shareholder and director; and Ner itself was not beholden to any force other than Shamekh's discretion and whims. At all times, Shamekh held himself out to the plaintiff as the alter ego of Ner. On balance, equitable considerations compel veil piercing in this situation. See, e.g., Baby Phat Holding Co., LLC v. Kellwood Co., 997 N.Y.S.2d 67, 70 (App. Div. 2014) (finding allegations sufficient to support a veil piercing theory where the defendant had dominated and controlled the negotiations on behalf of the corporation and the defendant personally provided information that persuaded the plaintiff to enter into the agreement at issue).

10. With respect to the complete control prong of the equitable analysis, the evidence is also sufficient to pierce LA Girl's corporate veil. LA Girl was undercapitalized; Zendedel acted as a personal guarantor of LA Girl's debts to the plaintiff; Zendedel exercised complete control of LA Girl as its sole shareholder and director; and LA Girl itself was not beholden to any force other than Zendedel's discretion and whims. At all times, Zendedel held himself out as the alter ego of LA Girl. On

balance, equitable considerations compel veil piercing in this situation. See, e.g., id.

11. Zendedel and Shamekh used the corporate form explicitly to perpetrate the fraud in this case, issuing post-dated checks from the corporate bank accounts in order to induce the plaintiff's reliance and representing themselves to the plaintiff at all times as the alter ego of their respective corporations. See Hyland Meat, 609 N.Y.S.2d at 626 (finding veil piercing appropriate because the defendants "used their control of the restaurant to induce the plaintiff to continue making deliveries of meat for which it was not paid."). Thus, the corporate veil should be pierced such that Shamekh and Zendedel are personally liable for the judgments against Ner and LA Girl, respectively, in this case.

**The Individual and Corporate Liability of the Defendants, Summarized**

12. The corporate veil should be pierced with respect to Ner and LA Girl, such that Shamekh and Zendedel are personally liable for the debts and obligations of Ner and LA Girl, respectively, in this case.

13. Shamekh and Zendedel are partners by estoppel with respect to the transactions between them and the plaintiff. Shamekh and Zendedel are therefore jointly and severally

liable for the debts and obligations of the other with respect to this case.

14. Because the doctrines of partnership by estoppel and veil piercing are applicable in this case, the four defendants, Zendedel, Shamekh, LA Girl, and Ner are all jointly and severally liable to the plaintiff for the damages in this case that are detailed below as partnerships between the individual defendants Shamekh and Zendedel and the corporate defendants Ner and LA Girl. Cf. John's Inc. v. Island Garden Ctr. of Nassau, Inc., 269 N.Y.S.2d 231, 235-36 (Dist. Ct. 1966) (corporations may be liable as partners), aff'd sub nom., C.J. Zonneveld & Sons, Inc. v. Island Garden Ctr., Inc., 280 N.Y.S.2d 34 (App. Term. 1967).

**The Defendants are Liable for Breach of Contract**

15. "Under New York law, a breach of contract requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011). Each of the elements has been established.

16. The individual and corporate defendants, acting jointly as partners, purchased merchandise memorialized in the

29

written invoice of August 2017 and on Memo in September 2017. The plaintiff performed on the contract by delivering the merchandise to the defendants. The defendants breached the contract by failing to pay the plaintiff what the plaintiff is due under the contract, resulting in monetary damages to the plaintiff. The defendants could have performed on the contract by paying the plaintiff what the plaintiff was due or could have attempted to rescind the contract by returning the merchandise to the plaintiff. The defendants have not done so, despite repeatedly being asked to perform by the plaintiff. The defendants are in clear breach of the agreements between the parties. See House of Diamonds v. Borgioni, LLC, 737 F. Supp. 2d 162, 170 (S.D.N.Y. 2010) (finding breach of contract when a buyer of diamonds refused to either pay or return the diamonds).

17. In addition, the checks themselves, given in consideration for the August and September 2017 transactions, are independent contracts that the plaintiff may sue under. See V.D.B. Pac. B.V. v. Chassman, 753 F. Supp. 2d 202, 205 (S.D.N.Y. 2010) ("Under New York law, a check embodies a statutory contract to pay the amount of the check in cash. If the check is dishonored, the creditor may sue either on

the dishonored check or the underlying debt.")
(alterations and quotation marks omitted).

18. All the defendants, both the corporate and individual defendants, manifested their intent to be bound by these contracts: the August 2017 invoice, the September 2017 memo, and the checks. The invoices were made out to LA Girl, but the checks were drawn from accounts bearing Ner's name. Shamekh personally filled out the information on the checks made out to the plaintiff. Zendedel personally guaranteed the payments for the August and September Transactions. This course of conduct between the defendants and the plaintiff manifests an intent by Ner and LA Girl as well as their alter egos Shamekh and Zendedel to be collectively bound to the total agreement between the parties as expressed in the checks and the invoices. See MBIA Ins. Corp. v. Royal Bank of Canada, 706 F. Supp. 2d 380, 396-400 (S.D.N.Y. 2009) (discussing situations when non-signatories may be liable for breach of contract under alter ego and joint venture theories when there is an intent to be bound).

19. The plaintiff may recover on the total unpaid sum as expressed in the August 2017 invoice and the September Memo or alternatively as expressed in the dishonored checks, because the plaintiff has established the

existence and genuineness of the checks, the defendants'
admission as to the issuance and execution of the checks,
the presentment of the checks for payment, and the failure
by the defendants to make payment. See Inner City
Telecomms. Network, Inc. v. Sheridan Broad. Corp., No. 10-
cv-3567, 2010 WL 2835559, at *2 (S.D.N.Y. July 13, 2010)
("Under New York law, a plaintiff seeking to show a prima
facie entitlement to summary judgment on a promissory note
must establish four elements: 'execution, delivery,
demand, and failure to pay.'") (quoting Soloman v.
Langler, 885 N.Y.S.2d 904, 904 (App. Div. 2009)).

20. In addition to the purchase price for the gold jewelry
products, the invoice for the August 2017 transaction (Ex.
11) provides that there is a 1.5% monthly finance charge
on all past due amounts, for which the defendants are
liable to the plaintiff. As of August 1, 2019, this sum is
equal to $51,150. The invoice for the August Transaction
and the Memo for the September Transaction (Exs. 11, 12)
provide that the plaintiff may recover collection fees,
attorney's fees, court fees, and all related expenses. The
amount of attorney's fees, court costs, and related
expenses owed to the plaintiff under the contract will be
determined after judgment is entered for the plaintiff.

See Fed. R. Civ. P. 54(d)(2)(B); O&G Indus., Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153, 167-68 (2d Cir. 2008).

## The Amount of Damages for Breach of Contract

21. As a foreseeable and proximate result of the defendants' breach of contract, the plaintiff has sustained the following damages: (1) $451,714.74 for the amounts owed for the August 2017 and September 2017 Transactions; (2) monthly finance charges for the amount of the August invoice that remains unpaid, which amounts to $51,150 up to August 1, 2019; and (3) collection fees, attorney's fees, court fees, and all related expenses.

22. Pursuant to N.Y. C.P.L.R. §§ 5001 and 5004, prejudgment interest accrues on the above amounts, at 9% per annum, from September 5, 2017, the date the total breach occurred, to the date of entry of judgment for the plaintiff. See Stanford Square, L.L.C. v. Nomura Asset Capital Corp., 232 F. Supp. 2d 289, 292 (S.D.N.Y. 2002) ("Prejudgment interest is awarded under New York law as a matter of right for contract damages.").

## The Defendants are Liable For Fraud

23. "Under New York law, for a plaintiff to prevail on a claim of fraud, he must prove five elements by clear and

convincing evidence: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997); see also Jo Ann Homes at Bellmore, Inc. v. Dworetz, 250 N.E.2d 214, 217 (N.Y. 1969) ("There must be a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury.").

24. Fraudulent intent may be shown through facts that show "both motive and opportunity to commit fraud" or by showing "strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (discussing allegations necessary to state a claim); Kramer v. Metro. Life Ins. Co., 154 N.Y.S.2d 565, 567 (Sup. Ct. 1956) ("Actual intent to defraud, or fraud in fact, like any other fact, may be shown by circumstantial evidence.") (internal quotation marks omitted), aff'd, 160 N.Y.S.2d 554 (App. Div. 1957), aff'd, 148 N.E.2d 320 (N.Y. 1958).

25. The recklessness of the defendant in a fraud claim is
    proven by conduct which "represents an extreme departure
    from the standards of ordinary care to the extent that the
    danger was either known to the defendant or so obvious
    that the defendant must have been aware of it." Chill v.
    Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996)
    (alterations, quotation marks, and citation omitted).

26. Issuing a check on a bank account with the knowledge that
    the funds in the account are insufficient to satisfy
    payment "in and of itself constitute[s] actionable fraud."
    Societe Generale Alsacienne de Banque, Zurich v.
    Flemingdon Dev. Corp., 500 N.Y.S.2d 278, 282 (App. Div.
    1986); see A. Sam & Sons Produce Co. v. Campese, 217
    N.Y.S.2d 275, 277 (App. Div. 1961) ("One who draws and
    delivers a check with knowledge that the funds are
    insufficient commits actionable fraud. Even when no oral
    representations are made, the act of drawing and
    delivering a check amounts to a representation that the
    drawer keeps an account with the drawee and that there are
    sufficient funds on deposit to meet it.") (internal
    citation omitted).

27. The fraud claim in this case is not duplicative of the
    breach of contract claim because the plaintiff has
    sufficiently proved a claim of fraudulent inducement that

is separate from its claim of breach of contract. The plaintiff proved not only that the defendants had no intent to carry out the contracts, but that the defendants fraudulently induced the plaintiff to enter into the contracts and deliver the merchandise. See <u>Alpha Capital Anstalt v. Oxysure Sys., Inc.</u>, 252 F. Supp. 3d 332, 340 (S.D.N.Y. 2017); <u>House of Diamonds</u>, 737 F. Supp. 2d at 171.

28.  The plaintiff has established all of the elements of its fraud claim by clear and convincing evidence.

29.  The evidence shows that the individual defendants, in partnership with one another and through the use of their alter ego corporations, induced the plaintiff to rely on the defendants' credit worthiness through the Las Vegas transaction and the July transaction. These transactions made the plaintiff believe that the defendants would pay for the merchandise purchased in connection with the August and September 2017 transactions. But the evidence shows that the defendants never intended to pay the plaintiff for the merchandise in connection with the August and September 2017 transactions. At that time, the defendants knew that the representations concerning their ability to pay were false. The defendants knew, but concealed, from the plaintiff that the corporate

defendants were insolvent and could not meet their obligations to honor the checks; the testimony of Shamekh at trial to the contrary is not credible.

30. The plaintiff reasonably relied on the acts and conduct of the defendants, who falsely portrayed themselves as credit worthy persons and corporations when, as the defendants knew, they were not. The defendants concealed from the plaintiff the fact that they were issuing bad checks to other jewelry and gold merchants at the same time that they entered into the fraudulent transactions with the plaintiff and induced the plaintiff to deliver the gold merchandise to the defendants. The evidence demonstrates that it was common in the jewelry business to conduct transactions between businesses in this way, through in-person exchanges and on Memo. It was reasonable for the plaintiff, through the individual Alishaev brothers, to believe that the defendants would act non-fraudulently and make payments when due. Based on all the facts and circumstances, the plaintiff reasonably relied to its detriment on the acts and conduct of the defendants in delivering gold jewelry products to the defendants with an expectation of prompt payment. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a

plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude the sophistication of the parties, and the content of any agreements between them."). Had the plaintiff been aware of these material facts, the plaintiff would not have entered into the August and September transactions, and they may recover for the damages sustained as a result of the defendants' fraudulent inducement.

31. As a proximate result of the defendants' fraudulent conduct, the plaintiff has incurred damages of $451,714.74, which constitutes the amount of unpaid monies on the merchandise from the August and September 2017 Transactions.

## The Defendants are Liable for Conversion

32. In New York, "conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (alterations and internal quotation marks omitted), certifying questions to, 864 N.E.2d 1272 (N.Y. 2007). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the

property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Pac. Int'l Corp. v. Raman Int'l Gems, Ltd., 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012) (internal quotation marks and alterations omitted). "Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." Id. (internal quotation marks omitted).

33. A claim for conversion will not lie under New York law where it merely restates or where it is predicated on a "mere breach of contract." MBL Life Assurance Corp. v. 555 Realty Co., 658 N.Y.S.2d 122, 124 (App. Div. 1997); see also Peters Griffin Woodward, Inc. v. WCSC, Inc., 452 N.Y.S.2d 599, 600 (App. Div. 1982). However, "the contracting party may also be held liable in tort where the conduct which constitutes a breach of contract also constitutes a breach of a duty distinct from, or independent of, the breach of contract." Conn. N.Y. Lighting Co. v. Manos Bus. Mgmt. Co., Inc., 98 N.Y.S.3d 101, 103 (App. Div. 2019).

34. The claim for conversion is not duplicative of the claim for breach of contract because the defendants engaged in fraudulent and wrongful conduct that goes beyond mere

breach of contract by fraudulently inducing the plaintiff to enter into the contracts in the first place. See, e.g., Astroworks, Inc. v. Astroexhibit, Inc., 257 F. Supp. 2d 609, 618 (S.D.N.Y. 2003) (refusing to dismiss as duplicative a claim for conversion when there were allegations of fraudulent misrepresentations and wrongful appropriation that went beyond breach of contract).

35.  The defendants are liable for converting the merchandise purchased during the August 2017 transaction because the defendants never obtained a possessory interest superior to that of the plaintiff over the merchandise that the defendants fraudulently induced the plaintiff to deliver to the defendants. See Brown v. Stinson, 821 F. Supp. 910, 913 n.3 (S.D.N.Y. 1993) ("At times, fraud or a bailee's misdeed may be sufficient interference with a chattel to support a claim for conversion."). The plaintiff therefore retained a possessory right superior to the defendants in the merchandise that the defendants took during the August 2017 transaction by fraudulently inducing the plaintiff to enter into the transaction. The defendants are liable for converting the merchandise taken by the defendants in the August 2017 transaction.

36.  The defendants are liable for converting the merchandise given to the defendants in September 2017 on Memo because

that merchandise was given to the defendants by
consignment and the evidence shows that in those
situations in the jewelry business, legal title remains
with the seller. See House of Diamonds, 737 F. Supp. 2d at
171-72. Thus, the plaintiff's possessory right in the
merchandise purchased on Memo was superior to the
defendants' possessory right.

37. The defendants are liable for damages calculated as the
value of the property at the time of the conversion. See
Rajeev Sindhwani, M.D., PLLC v. Coe Bus. Serv., Inc., 861
N.Y.S.2d 705, 708 (App. Div. 2008). The defendants are
liable for $451.714.74 in damages, which is the total
amount of the August and September 2017 Transactions.

**The Plaintiff is Entitled to an Order of Replevin**

38. "Replevin is a remedy employed to recover specific,
identifiable items of personal property." TAP Manutencao e
Engenharia Brasil S.A. v. Int'l Aerospace Grp., Corp., 127
F. Supp. 3d 202, 211 (S.D.N.Y. 2015) (alterations and
internal quotation marks omitted). To determine who has
the superior possessory right to a chattel for purposes of
an order of replevin when the defendants come into the
property lawfully, the plaintiff must establish that it
made a demand for possession and was refused. See

<u>Christie's Inc. v. Davis</u>, 247 F. Supp. 2d 414, 419
(S.D.N.Y. 2002).

39. With respect to the merchandise obtained in the August
2017 Transaction, the plaintiff has the right to an order
of replevin because the plaintiff has shown that it was
fraudulently induced to part with the merchandise and "the
replevin of goods obtained by fraudulent representations
has always been permitted in New York." <u>Scutti Pontiac,
Inc. v. Rund</u>, 402 N.Y.S.2d 144, 148 (Sup. Ct. 1978).
Therefore an order of replevin with respect to the August
2017 merchandise is appropriate.

40. With respect to the merchandise delivered in the September
2017 transaction, the plaintiff has a superior possessory
interest in the merchandise taken by the defendants
because it is in the nature of a transaction of
merchandise on Memo that title remains in the seller until
the buyer fully pays. The plaintiff has also established
that it was induced to transact with the defendants in
September 2017 by fraudulent assurances of the defendants'
credit worthiness. The plaintiff has also established that
it made a demand on the defendants to return the
merchandise in connection with the September 2017
transaction and that the defendants refused. Therefore an

order of replevin is warranted with respect to the
merchandise delivered in the September 2017 transaction.

41. The plaintiff is entitled to an order of replevin for the
return of the unpaid jewelry products from the August and
September 2017 Transactions that are in the possession,
custody, or control of any of the defendants.

**The Applicability of the New York Debtor and Creditor Law**

42. To prevail on a claim under the New York Debtor and
Creditor Law § 273-a, the plaintiff must establish that a
defendant in a suit for money damages, while a defendant,
(1) conveyed some property without fair consideration, (2)
that a judgment was docketed against the defendant, and
(3) that the defendant failed to satisfy the judgment.
Dempster v. Overview Equities, Inc., 773 N.Y.S.2d 71, 74
(App. Div. 2004).

43. Under the New York Debtor and Creditor Law § 273, "[a]
conveyance that renders the conveyor insolvent is
fraudulent as to creditors without regard to actual
intent, if that conveyance was made without fair
consideration." CIT Grp./Comm. Servs., Inc. v. 160-09
Jamaica Ave. Ltd. P'ship, 808 N.Y.S.2d 187, 189 (App. Div.
2006). "A person is insolvent when the present fair
salable value of his assets is less than the amount that
will be required to pay his probable liability on his

existing debts as they become absolute and matured." N.Y. Debtor & Creditor Law § 271(1).

44. As applicable to Sections 273-a and 273, fair consideration requires both that the amount given for the transferred property was a fair equivalent and that the transaction was made in good faith, by both the transferor and the transferee. See Sardis v. Frankel, 978 N.Y.S.2d 135, 141 (App. Div. 2014). "[T]he transfer of corporate assets to an insider establishes a lack of good faith as a matter of law" so long as "the transfer of assets [goes] either directly to the insider or to an entity controlled by the insider." Mega Personal Lines, Inc. v. Halton, 780 N.Y.S.2d 409, 411 (App. Div. 2004).

45. Section 276 of the New York Debtor and Creditor Law provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Unlike Sections 273 and 273-a, Section 276 of the New York Debtor and Creditor Law addresses actual fraud, rather than constructive fraud, and further does not require that the party seeking to set aside the conveyance prove unfair consideration or insolvency. See Wall St. Assocs. v. Brodsky, 684 N.Y.S.2d

244, 247 (App. Div. 1999). Because of the difficulty of proving actual intent, the plaintiff may rely on circumstances that give rise to an inference of actual intent, such as "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property after the conveyance." Id. Thus, although lack of consideration is not a prerequisite to setting aside a conveyance as fraudulent under Section 276, the lack of consideration given is one factor that courts use to determine whether the conveyance was made with actual intent to defraud.

46. Zendedel did not violate Section 273-a when he transferred to Shamekh the Deed of Trust to Zendedel's California home in September 2017 because there had yet to be a judgment docketed against the defendants at that time. See Ray v. Ray, 970 N.Y.S.2d 9, 12 (App. Div. 2013) (dismissing a claim under Section 273-a because there was no judgment against the defendant when she made the alleged fraudulent conveyance).

47. Zendedel's conveyance of the Deed of Trust in his house to Shamekh in September 2017 cannot be set aside as

fraudulent under Section 273 because the plaintiff has introduced no evidence that the deed of trust was transferred without consideration. See In re Borriello, 329 B.R. 367, 373-74 (Bankr. E.D.N.Y. 2005) (stating that the burden of proof lies with the party seeking to set aside the fraudulent conveyance to prove a lack of fair consideration by a preponderance of the evidence).

48. However, the plaintiff is entitled to set aside as fraudulent the transfer of the Deed of Trust mortgaging Zendedel's home to Shamekh in September 2017 under New York Debtor and Creditor Law Section 276. Section 276 does not require proof of insolvency or a lack of consideration for the transfer. Rather, all that is required under Section 276 is that the plaintiff prove that Zendedel engaged in actual fraud by the conveyance in an attempt to frustrate present or future creditors. See Wall St. Assocs, 684 N.Y.S.2d at 247-48.

49. The plaintiff points to sufficient evidence from which it can be concluded that Zendedel transferred the Deed of Trust in September 2017 with the "actual intent" to defraud the plaintiff, the defendants' creditor. Zendedel transferred the Deed of Trust in his home in September 2017 to his partner by estoppel and a defendant in this case, shortly after the fraudulent transaction on

September 5, 2017 at which time Zendedel undertook a personal guarantee for the merchandise taken by Memo. The proximity of the conveyance to the defendants' fraudulent activities during the August and September 2017 transactions establishes that Zendedel intended to frustrate anticipated creditors. See Secs. Inv. Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 316 (Bankr. S.D.N.Y. 1999) (knowledge by the transferor of ailing financial condition and debts of the corporation supported an inference that the conveyance was fraudulent under Debtor and Creditor Law Section 276). These circumstances – the conveyance of the Deed of Trust to a partner by estoppel shortly after the fraudulent September 2017 transaction – constitute "badges of fraud" that give rise to the conclusion that Zendedel and Shamekh sought to frustrate collection of debts and to render Zendedel judgment proof by virtue of the conveyance. See Pen Pak Corp. v. LaSalle Nat'l Bank of Chicago, 658 N.Y.S.2d 407 (App. Div. 1997) (finding badges of fraud sufficient to survive summary judgment); Wall St. Assocs., 684 N.Y.S.2d at 248 (finding stock transfers that were intended to defeat anticipated creditors supported a claim under Debtor and Creditor Law Section 276).

50. The plaintiff is not entitled to set aside as fraudulent the conveyance made to Zendedel's wife in April 2018 under Sections 273 or 273-a for the same reason that the plaintiff cannot set aside the conveyance made to Shamekh in September 2017 under those sections. The April 2018 conveyance to Zendedel's wife occurred before there was a judgment docketed in this case and the plaintiff introduced no evidence that the April 2017 conveyance was made without adequate consideration.

51. Moreover, the plaintiff is not entitled to set aside the conveyance from Zendedel to his wife in April 2018 because Zendedel's wife is not a party in this case and has not been given an opportunity to appear before the Court as a non-party. See City of Almaty, Khazakhstan v. Ablyazov, No. 15-cv-5345, 2019 WL 4747654, at *4 (S.D.N.Y. Sept. 30, 2019) ("In order for the Khazakh entities to set aside the assignment and deprive the Chetrit Entities of their property, they would need to sue the Chetrit Entities for fraudulent conveyance."); see also Allstate Ins. Co. v. Mirvis, No. 08-cv-4405, 2018 WL 4921631, at *7-10 (E.D.N.Y. Sept. 4, 2018) (discussing arguments made by non-party transferees' who appeared on a motion to set aside conveyances as fraudulent under Section 276).

52. The plaintiff is therefore entitled to set aside as fraudulent only the September 2017 conveyance to Shamekh and only under New York Debtor and Creditor Law Section 276.

53. The plaintiff is entitled to an award of attorney's fees pursuant to New York Debtor and Creditor Law Section 276-a. See 5706 Fifth Ave., LLC v. Louzieh, 969 N.Y.S.2d 141, 142 (App. Div. 2013) ("A plaintiff that successfully establishes actual intent to defraud is entitled to a reasonable attorney's fee under Debtor and Creditor Law § 276-a.").

## The Plaintiff is Not Entitled to a Constructive Trust

54. "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Counihan v. Allstate Ins. Co., 194 F.3d 357, 360 (2d Cir. 1999) (alteration and internal quotation marks omitted). The purpose of a constructive trust is to be an equitable remedy used to prevent unjust enrichment. See id. at 361.

55. "New York courts have clarified that 'as an equitable remedy, a constructive trust should not be imposed unless

it is demonstrated that a legal remedy is inadequate.'" N. Shipping Funds I, LLC v. Icon Capital Corp., 921 F. Supp. 2d 94, 107 (S.D.N.Y. 2013) (alteration omitted) (quoting In re First Cent. Fin. Corp., 377 F.3d 209, 215 (2d Cir. 2004)). Thus, "where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists, and a constructive trust should not be imposed." Id. (quotation marks omitted).

56. A valid agreement controls the rights and obligations of the parties in this case with respect to the gold jewelry. The merchandise taken on Memo by the defendants and the merchandise that was transferred to the defendants during the August Transaction are governed by the invoices. The plaintiff has not established that legal remedies will be legally inadequate in this case. See First Cent. Fin. Corp., 377 F.3d at 216 ("We concede that FCIC, like many other creditors, will not, in all probability, be made whole in the proceedings; but that does not mean that its remedy is legally inadequate, simply that it is imperfect."). Because the plaintiff has an adequate remedy at law under the contractual agreements between the parties, there is no cause to impose a constructive trust.

## The Defendants are Not Liable for Punitive Damages

57.　"In New York, a demand for punitive damages usually arises in the context of an action to recover damages for intentional torts, such as fraud, libel, or malicious prosecution[.]" <u>Gomez v. Cabatic</u>, 70 N.Y.S.3d 19, 26 (App. Div. 2018). "An award of punitive damages serves the dual purpose of punishing the offending party for wrongful conduct and deterring other from engaging in similar conduct." <u>Id.</u> at 25. "In determining the amount of punitive damages, the trier of fact can properly consider all circumstances immediately connected with the transaction tending to exhibit or explain the motive of the defendant, the harm done to the plaintiff, the wealth of the defendant, and the degree of deterrence resulting from the award." <u>Laurie Marie M. v. Jeffrey T.M.</u>, 559 N.Y.S.2d 336, 342 (App. Div. 1990), <u>aff'd</u>, 575 N.E.2d 393 (N.Y. 1991). "Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts." <u>Nardelli v. Stamberg</u>, 377 N.E.2d 975, 977 (N.Y. 1978).

58.　Punitive damages are inappropriate in this case because the fraud is not so wanton and blatant as to warrant

punitive damages; the defendants appear to be lacking in resources; the harm done to the plaintiff appears no different from the harm that occurred as a result of the breach of contract; the plaintiff will be made whole by traditional compensatory damages to the extent that the defendants have any resources; and an award of punitive damages would have little deterrent effect, either specifically with respect to these defendants or more generally.

## Election of Remedies and Double Recovery

59. The plaintiff has established its right to damages based on breach of contract, fraud, and conversion. The plaintiff has also established its right to an order of replevin for the unpaid goods in the defendants' possession that were the subject of the August and September 2017 transactions.

60. Under the doctrine of election of remedies, "[a]n action to rescind a contract of sale on the ground of fraud and to recover goods alleged to have been sold in reliance upon fraudulent representations is inconsistent with an action on the contract of sale." Am. Woolen Co. of N.Y. v. Samuelson, 123 N.E. 154, 155 (N.Y. 1919). Further, "[a]fter disaffirming a contract and bringing a suit in

replevin for the goods sold, a party has no remedy on the contract of sale." Id. At the same time, it has long been recognized that the doctrine of election of remedies is a harsh doctrine, and that in order to "bar the pursuit of alternative relief, legal and equitable, a party must have chosen one of two or more co-existing inconsistent remedies, and in reliance upon that election, that party must also have gained an advantage, or the opposing party must have suffered some detriment." Prudential Oil Corp. v. Phillips Petroleum Co., 418 F. Supp. 254, 257 (S.D.N.Y. 1975).

61. To the extent that there have been alternative and inconsistent theories of recovery pressed in this case, there has been no advantage to the plaintiff nor detriment to the defendants throughout this litigation.

62. "To avoid double recovery, a party generally cannot recover both the full value of the converted property and the return of the property itself." Red Hook Container Terminal LLC v. S. Pac. Shipping Co. Ltd., No. 15-cv-1483, 2019 WL 4509025, at *3 (S.D.N.Y. Sept. 19, 2019); cf. Restatement (Second) of Torts § 922(1) (1979) ("The amount of damages for the conversion of a chattel is diminished by its recovery or acceptance by a person entitled to its possession.").

63. In the course of satisfying the plaintiff's damages claim for breach of contract, which includes contract interest and statutory prejudgment interest, and which includes the damages for conversion and fraud, the defendants are entitled to mitigate those damages through the return of the plaintiff's property with respect to which the order of replevin will issue.

64. If an order of replevin successfully results in the return to the plaintiff of merchandise worth a certain amount under the contracts between the parties, then the defendants may reduce their liability by that certain amount against the principal, except that the defendants will remain liable for the monthly finance charge of 1.5% in interest under the contract on the unpaid amount of the August 2017 invoice, which amounted to $51,150 up to August 1, 2019, and prejudgment interest at a rate of 9% per annum from September 5, 2017 to the date of judgment calculated on the total damages resulting from the original breach.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit.

The plaintiff should submit a proposed judgment consistent with the above Findings of Fact and Conclusions of Law together with any supporting Memorandum fourteen (14) days after the date of this Opinion. The defendants may submit any objections and counter-judgment seven (7) days thereafter.

**SO ORDERED.**

**Dated:      New York, New York**
**            March 27, 2020      /s/ John G. Koeltl**
**                                      John G. Koeltl**
**                               United States District Judge**